NOT DESIGNATED FOR PUBLICATION

No. 122,288

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.P., T.P., and E.P.,
Minor Children.

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARY E. CHRISTOPHER, judge. Opinion filed June 26, 2020. Affirmed.

*Rachel I. Hockenbarger*, of Topeka, for appellant natural mother.

*Morgan L. Hall*, deputy district attorney, for appellee State of Kansas.

*Jennifer Martin Smith*, of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, guardian ad litem.

Before SCHROEDER, P.J., HILL and GARDNER, JJ.

PER CURIAM: A mother of three children appeals the district court's termination of her parental rights. We will refer to the children by their initials, A.P., T.P., and E.P. At the time of the trial, they were ages 11, 13, and 14. We find no reversible error. Our review of the record forces us to conclude that the district court is correct. As a result, we affirm.

1

*The case history reveals shocking living conditions.*

This was not the first intervention by the court into this family. The court had removed all three children from Mother's custody three times before this occasion. Father is deceased. In 2007, the children were removed from Mother's care based on concerns of neglect and that Mother was overwhelmed. In 2011 and 2012, the children were removed from Mother's care after finding the motel room they were living in was covered in feces, urine, blood, old food, and other items strewn about. The children were very dirty and smelled strongly of feces. In 2012, the report showed the motel room was "'ruined,'" and the housekeeper threw up upon entry. The court continued supervision of Mother's case from 2012 until April 2017. The children's circumstances deteriorated quickly.

As early as August 2017, the Kansas Department for Children and Families began receiving reports about Mother's neglect of the children again. DCF received a report alleging A.P. caught the stove on fire while trying to cook. The school social worker reported that E.P. and T.P. had strong odors, their hair appeared matted, there was no food in their home, and they tried to sleep during the day because they did not have beds at home. Another report revealed E.P. had worn the same clothes for a week, T.P was wheelchair-bound, and Mother was neglecting her physical therapy. Two DCF investigators approached the home and noticed a foul odor coming out of the open windows that smelled like feces and urine. Mother refused to let the investigators into the home.

In September 2017, DCF received additional reports of the lack of supervision and physical neglect of the children, the home was unsanitary, and E.P. came to school unbathed and in dirty clothes. In addition, T.P. was seen running down the street with E.P. chasing her.

On September 13, 2017, a DCF investigator and her intern went to the home. Mother answered the door nude. Mother put clothing on, but her odor was "so overwhelming" the investigator had to back up. Her clothing was unkempt and soiled, as was E.P.'s clothing. The investigator saw trash, rotting food, dirty dishes, and human feces throughout the home. Flies were swarming. The investigator had to breathe through her mouth because there was a "very, very strong odor." The intern gagged and stayed outside the residence. There were brown, crusty, odorous stains smeared on the walls. T.P.'s wheelchair had human feces in it. Soiled clothing was scattered throughout the hallway. Another wheelchair—for the shower—contained a "very large amount" of human feces. The children did not have beds. In E.P.'s room, a corner of the room was filled with dog feces. There was nothing other than blankets on the floor in the girls' bedroom. All three children were home during school hours.

Topeka police responded to assess the safety of the home. The officers noticed the odor and saw rotting food in the kitchen and bugs, trash, and feces throughout the home. The children were placed in police protective custody.

When the State petitioned the court alleging the children to be in need of care, the district court placed all three in the temporary custody of DCF. Mother stipulated to the facts alleged in the petition, and the court adjudicated the children to be in need of care and ordered a case plan goal of reintegration.

In October 2018, the State and the guardian ad litem jointly filed a motion for a court finding of unfitness and termination of Mother's parental rights.

*Many witnesses testified at the trial of the joint motion.*

At trial in May 2019, Erika Bunce, an intensive in-home therapist for KVC Kansas, testified that she was assigned to perform aftercare services for the family in

3

August 2016, when the children were previously reintegrated with Mother. Bunce testified that for the first 3 or 4 months Mother was "very resistant" to services. She yelled and screamed and "very rarely" allowed Bunce into the home. As Bunce worked with her, things did get better. Mother's home met the "minimum" standard of cleanliness, meaning there was no feces or urine anywhere.

Bunce testified that KVC had bought mattresses and bed frames for the children, but Mother threw them away because she wanted new beds. Later either the school or KVC bought air mattresses for the children, but the dog clawed or chewed at them and they broke.

Bunce testified that T.P. had rheumatoid arthritis and was supposed to be up and moving as much as possible to keep it from getting worse. But Mother would not make T.P. get up and move. T.P. went from walking to the point where she refused to get out of her wheelchair. As for the youngest child, A.P.'s behavior was "out of control." The oldest child, E.P., understood Mother was not doing what she was supposed to do. Bunce recalled E.P. telling Mother, "no, this is your fault. . . . We're going to be taken again."

Bunce testified that Mother had adequate resources. Mother received social security income for herself and the children and death benefits because of the children's deceased father, amounting to an income of $2,514 per month. Mother also had Shelter Plus benefits for housing, which allowed her to pay a reduced rent; food stamps; medical cards for the children; and a bus card for herself.

Bunce testified to the many services Mother and the children had been provided:
- services through the Family Service and Guidance Center;
- family and individual therapy;
- medication management;

4

- CDDO (Community Developmental Disability Organization - provides services that help the children bathe, using the toilet, and outings in the community); and
- case management through Valeo.

But Mother would not allow the CDDO service personnel into her home. She was assigned someone from STEPS, who would have helped with bathing, cleaning, and outings for the children, but Mother never allowed the STEPS person into her home. Mother also refused to sign a release so that Bunce could speak with her individual therapist. Bunce testified that once she started to ease Mother out of needing aftercare services, "things just started to go poorly again." Bunce's aftercare services ended in June 2017. The children had to be removed from the home again in September 2017.

Valarie Alexander, the property manager at Southbrook Apartments where Mother lived, testified that in April 2017, there was so much food and residue caked on Mother's oven and stove that it was a fire hazard; there was spoiled food and dirty dishes throughout the kitchen; the apartment was infested with roaches because of the food being left out; and the bathroom floor was covered in urine and blood. Neighbors complained about the smell. The condition of the apartment was a safety hazard. Mother was given notice to clean the apartment. Mother never cleaned the apartment and her lease was terminated in February 2018. Alexander testified that Mother was paying $50 to $55 per month in rent for a $750 per month apartment based on her Shelter Plus benefits.

After Mother was evicted for failing to clean her apartment, she lived with a friend in Topeka and then at the rescue mission. She never gave KVC her friend's apartment number or allowed them into the apartment.

Megan Fitzgerald, a social worker in the rheumatology clinic of Children's Mercy Hospital, testified she met with T.P. in June 2016, when T.P. was diagnosed with juvenile idiopathic arthritis. T.P. was in state custody at that time. She recalled that she explained to Mother that she would need to reapply for Medicaid when the children were reintegrated into her home. Yet Mother let the Medicaid coverage lapse. Fitzgerald connected her with a hospital financial counselor. Fitzgerald also referred Mother to an insurance case manager to help her find a primary care doctor for T.P. that took Medicaid, but Mother refused those services.

Tricia Musil, a child protection specialist for DCF, testified she was assigned to investigate in August 2017. Musil determined Mother had missed three of T.P.'s appointments to get Remicade infusions to help with the pain from her arthritis, and Mother had not pursued physical and occupational therapy for T.P. Kimberly Tennison, a nurse practitioner in the rheumatology clinic at Children's Mercy Hospital, verified that two infusion appointments were missed in 2017. She emphasized it was important that T.P. participate in physical and occupational therapy to maintain her range of motion, mobility, and ability to get around. Tennison testified that T.P. would have a lot of medical needs for the rest of her life.

Jaye Mueller, a clinical social worker, testified that E.P. had been misdiagnosed with autism in 2012, in her opinion "due to the early years of deprivation." He did not speak or walk until a late age and was "fairly undisciplined" as a child. E.P. did have attention deficit hyperactivity disorder and posttraumatic stress disorder. He had an I.Q. of 82 and would require some form of assisted living. E.P. required consistency and structure and "would be lost" without it. E.P. has had bad dreams about children sleeping on the floor of a very dirty home with soil on the floor. E.P. did not like to talk about Mother.

Kimberly Marcos, a social worker/therapist, testified A.P. had PTSD. Marcos was working with A.P. on coping skills because she had a lot of meltdowns; learning to trust; raising her self-esteem; and learning physical boundaries so she did not just dart out of class. Marcos testified that A.P. was doing well in her foster home. As for her Mother's parental rights being potentially terminated, A.P. had said, "I just want to be with my siblings. I—I can see mom when I'm 18." At 11 years old, A.P. recognized that she needed to be in a more stable home than Mother's home. A.P. did not mention Mother except to say, matter-of-factly, that Mother was late or did not show to a visit. A.P. said that she did not believe Mother could take care of her and her siblings. While in custody, A.P.'s behaviors were improving, and she was doing better at school.

Jennifer Emfinger, a supervisor in the permanency department at KVC and the case manager for this case, testified that Mother was assigned the following case plan tasks:

- obtain and maintain safe and stable housing that met minimum standards of cleanliness;
- obtain a verifiable legal source of income sufficient to meet the needs of the children;
- sign all necessary releases for KVC to communicate with professionals;
- be informed and attend all educational, medical, and mental health appointments of the children; and
- complete a mental health evaluation and follow those recommendations.

Emfinger testified Mother did sign the releases but did not complete the other tasks. She did not provide documentation of her social security income. Mother had been provided gas cards and a bus pass with the bus schedule to assist with transportation to the appointments and visitations. She did not attend all of her children's appointments. Mother initially had been offered weekly visits with the children, but she was inconsistent

7

in attending the visits, so they were changed to every other week. When the case plan goal was changed to adoption, the visits were offered once a month.

Emfinger testified the agency had identified an adoptive resource for each of the children. She testified the children were "thriving" in their placements; "all needs are being met." And she testified that the agency would be unable to reintegrate even just one of the children with Mother because Mother had not completed her case plan tasks, particularly maintaining a safe and stable home and attending all the appointments for that child.

Megan Kocher, a family support worker for KVC, verified that Mother was given a schedule of her children's medical and IEP appointments, but missed several appointments. Kocher testified when she had transported E.P. to visitations, he had said to her, "I bet you mom's not going to be there."

Mary Mitchell, a case manager at Valeo Behavioral Health Center, testified Mother had diagnoses of major depression and posttraumatic stress disorder. Mitchell worked with Mother since May 2016, trying to help her be successful in the community. She worked with Mother to find her housing. She testified she met with Mother every week in 2017. But for the majority of 2018, the meetings were "[off] and on." During that time, Mitchell unsuccessfully tried to contact Mother, but Mother did not reach out to her. She testified Mother was resourceful. Mother could communicate her needs and use resources she knew about. But she needed support. Mother would try to get help from other resources but got overwhelmed. In 2017, she got overwhelmed by having her three children back in her house and by "life." Mitchell testified Mother was a great parent and she "lives for her kids." Mitchell testified the children were happy with and loved Mother.

Kathryn Hunter, a mental health therapist, testified she had provided family therapy and individual therapy to Mother and had tried to teach Mother parenting skills. Mother was struggling to get connected to resources in the community, navigating the health care system, and working with the Family Service and Guidance Center. She struggled to trust agencies and professionals. Her distrustfulness could be a symptom of PTSD, and her inability to keep a house clean could result from depression. In her opinion, Mother needed to keep meeting with a therapist. She had not discharged Mother, but she last met with Mother in July 2018.

*Mother testified.*

Mother testified T.P. was receiving occupational therapy at Family Service and Guidance and physical therapy at school. She testified that in the summer of 2017, A.P. was doing a summer program with Family Service and Guidance, E.P. was receiving 19 hours a week of in-home attendant care services, and T.P. was receiving 32 hours a week of attendant care services.

She admitted that when she struggled with depression, she could not keep her home clean. She did not clean up her apartment between September 2017 and February 2018 because "what I was dealing with, at that time, was the fact that—that my kids were removed again." She testified that she had a two-bedroom apartment as of April 9, 2019, and she was receiving $771 in monthly social security income. She testified she missed appointments and visits because she was not told about them. She admitted that she could not handle all three of her children "right now." She wanted custody of only E.P. and the two girls to be adopted.

The parties submitted written closing statements. We note with great interest the summation of the guardian ad litem. The attorney first explains her experience with the case.

"I have worked with [Mother] longer and more consistently than anyone on this case. I have watched all three of these children [grow] from infants and toddlers to delightful young people. I have tried to boost mother's self-esteem and prod her into providing basic care for these children because I know she loves them, and they love her."

After that, counsel for the children emphasized the whole point of the proceeding.

"But at the end of the day, it is not in the best interest[s] of these children to return once again to their mother's home. These children have grown up in the system and it has affected them. [A.P.] and [E.P.] both struggle with PTSD and anxiety. They need stability and to know that they will always have beds to sleep on and clean clothes to wear. We have given mother 12 years to show that she can care for her children. It is now time to show the children that we care enough for them to not spend any more of their short childhood waiting for their mom to provide the care to which they are entitled."

From the perspective of the independent attorney appointed for the children, severance of Mother's parental rights is vital to the children's wellbeing.

*What the court found*

The trial court took great pains in making its reasoning known. The court found Mother was unfit based on the following statutory factors:

- Emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature which rendered her unable to care for the ongoing physical, mental, and emotional needs of the children. K.S.A. 2019 Supp. 38-2269(b)(1).
- Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family. K.S.A. 2019 Supp. 38-2269(b)(7).

10

- Lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child. K.S.A. 2019 Supp. 38-2269(b)(8).

The court took judicial notice of the prior CINC cases and found that in each of those cases Mother had "let the condition of the home deteriorate to the point where children and the respective homes were covered in human feces and the children's health and welfare were endangered if not removed from the home." The court found that after each removal "intensive services" were implemented by various agencies, but that once the children were reintegrated into Mother's home, Mother quickly returned to her old habits. Human feces, urine, blood, rotting food, trash, and flies were strewn throughout her home and the children were filthy, odorous, and unsupervised. The children did not have beds to sleep on. The court found these conditions were persistent, rather than isolated events.

The court found Mother had been uncooperative, had yelled and screamed at agency workers, refused to allow social services workers into her home, had refused to accept services offered to assist her, and failed to secure insurance and care necessary for the children's wellbeing. Mother refused in-home services from STEPS which would have helped with bathing the children, cleaning up, and taking the children on outings. Prior efforts to maintain the family unit include, but were not limited to, family preservation, mental health, and TARC services, parenting classes, cash assistance, food stamps, a safety plan, medical assistance, and Healthy Families. The court found services were provided to the family almost continually since 2007. Mother and the children also received disability and death benefits, greatly reduced rent, bus passes, and KanCare medical insurance.

The court found Mother refused to allow the agency to investigate her mental health status, failed to follow up with a mental health evaluation requested by the agency,

11

and failed to follow through with treatment to address her mental health diagnoses. She has not consistently maintained housing. Visitations were irregular. The court found the children were thriving in their out-of-home placements.

The court found Mother's conduct was unlikely to change in the foreseeable future and it was in the children's best interests to terminate her parental rights.

*Mother's contentions on appeal*

Mother first claims that the district court erred in finding her unfit because of conduct or condition which renders her unable to care properly for her children. She also disagrees with the court's conclusion that the conduct or condition is unlikely to change in the foreseeable future. For her second argument, she contends the court erred in finding that the termination of her parental rights is in the best interests of her children. We will address those claims in that order.

*The law that controls our ruling is well established.*

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008). See also *In re X.D.*, 51 Kan. App. 2d 71, 73-74, 340 P.3d 1230 (2014) (the right to be the legal parent of a child is a fundamental right).

The State must prove by clear and convincing evidence that the parent is unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." K.S.A. 2019

Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in determining unfitness. K.S.A. 2019 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2019 Supp. 38-2269(c). Any one of the factors in K.S.A. 2019 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2019 Supp. 38-2269(f).

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2017 Supp. 38-2269(g)(1). This court's standard of review is well-established:

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated. [Citation omitted.]" *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

See also *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008) (child in need of care finding). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

Mother contends none of the statutory bases for finding her unfit were supported by clear and convincing evidence. Specifically, Mother first contends that she struggled to manage her depression and anxiety when all three of her children were in her care. That is not disputed. But she asserts that she was without resources or meaningful

assistance. Mother cites K.S.A. 2019 Supp. 38-2201(c)(1) and (2), prohibiting discrimination on the basis of disability:

> "(1) The disability of a parent shall not constitute a basis for a determination that a child is a child in need of care, for the removal of custody of a child from the parent, or for the termination of parental rights without a specific showing that there is a causal relation between the disability and harm to the child.
> (2) In cases involving a parent with a disability, determinations made under this code shall consider the availability and use of accommodations for the disability, including adaptive equipment and support services."

Mother contends that the State did not consider the use of an accommodation, specifically providing support services in her home when the children were reintegrated. She contends the agencies' efforts to rehabilitate the family were not reasonable because they did not address the challenge of her needing ongoing assistance to parent three high-needs children.

To the contrary, the record reveals that Mother's assertions that she was without meaningful support services are untrue. The record shows that the various agencies did address the ongoing assistance Mother needed. Bunce testified to the many services Mother and the children had been provided. Mother received aftercare services from KVC for almost a year after the children were reintegrated in 2016.

Mother was given assistance with housing, setting up a "chore chart," learning parenting skills, handling the children's behaviors, setting up a safety plan, getting furniture, managing medications, eating healthy, and budgeting, among other things. Mother testified that during the summer of 2017, just before the children were removed from her home, A.P. was in a summer program with Family Service and Guidance, E.P. was receiving 19 hours a week of in-home attendant care services, and T.P. was receiving 32 hours a week of attendant care services. During that time, Mother was assigned

14

someone from STEPS, who would have helped with bathing, toileting, and cleaning, but Mother never allowed the STEPS person into her home.

Mother and the children had received family and individual therapy, which included parenting skills. Mother discontinued meeting with her mental health therapist in July 2018, even though she had not been discharged. Mother was meeting weekly with her case manager from Valeo in 2017, but then did not reach out to her regularly in 2018, though this service was available to her. Mother was given gas cards, bus passes, and bus schedules so she could attend the children's appointments and visitations, but she still missed many appointments and visitations to the point that E.P. would "bet" that she was not going to be there.

Mother had an apartment through Shelter Plus with highly reduced rent in 2017. Mother was given 10 months after receiving notice from the property manager to clean her apartment before she was evicted in February 2018. She failed to ever clean the apartment even though the children were in foster care beginning September 2017.

The statute requires reasonable efforts to rehabilitate the family. "'The purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort.'" *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019). The agency's efforts here were more than reasonable. But Mother failed to use the resources offered and failed to implement skills she had learned. Even with all the services provided to Mother, she failed to maintain a safe and stable home and she missed visits with her children. The agency made every effort to reintegrate these children with Mother and did reintegrate them three times before. But each time Mother could not maintain a stable and safe home.

Mother also contends that no effort was made to reintegrate one child at a time to help her build the capacity to take care of her children. This contention seems consistent

15

with Mother's desire to keep one child and let the other two be adopted. We are not impressed with Mother's attempt to bargain with the agency that has custody of her children.

The KVC case manager testified that the agency would be unable to reintegrate even just one of the children with Mother because Mother had not maintained a safe and stable home or attend the appointments for that one child. Mother's unfitness to care for even one child was unlikely to change in the foreseeable future. She could not manage to clean her apartment in late 2017 and early 2018 even with having no children to care for. Past conduct suggests future behavior. *In re M.S.*, 56 Kan. App. 2d at 1264. At the time of trial (May 2019), Mother had just obtained a new apartment, but had not proven she could maintain it. Courts must measure the foreseeable future in "child time." K.S.A. 2019 Supp. 38-2201(b)(4). Children experience the passage of time in a way that makes a month, or a year seem much longer than it would for an adult. *In re M.S.*, 56 Kan. App. 2d at 1263-64. There was no telling when, if ever, Mother could manage one child in her home.

Mother contends that she tried to adjust herself to meet the needs of her children, completing all the case plan tasks.

But Mother's case manager disputed that she completed the case plan tasks, particularly maintaining a safe and stable home and attending the children's appointments and visitations. We do not weigh conflicting evidence. See *In re B.D.-Y.*, 286 Kan. at 705.

Mother finally contends that there was no clear and convincing evidence that it was in the best interests of the children to terminate her parental rights. Mother contends the court should have balanced her fundamental right to raise her children against her

16

children's best interests, citing *In re L.B.*, 42 Kan. App. 2d 837, 842, 217 P.3d 1004 (2009).

But *In re L.B.* considered whether the mother was entitled to an untimely appeal. It did not impose a requirement that courts perform an overt on-the-record balancing test to determine the children's best interests. See *In re R.G.*, No. 120,300, 2019 WL 2063611, at *7 (Kan. App. 2019) (unpublished opinion). The statute directs that upon finding a parent unfit, the court shall consider whether termination of parental rights is in the best interests of the children, giving "primary consideration" to the physical, mental, and emotional health of the children. K.S.A. 2019 Supp. 38-2269(g)(1).

The record shows that the children were thriving in their out-of-home placements with their needs being met. Mother, on the other hand, could not care for the children. While there was no dispute that Mother loves her children and the children love her, their needs have not been met in Mother's care. E.P. requires consistency and structure because of his ADHD and PTSD, T.P. requires a lot of medical appointments to maintain her mobility due to severe arthritis, and A.P. requires help with her PTSD and behavioral problems. At their young ages, E.P. recognized Mother was not doing what she was supposed to do and would make bets that Mother was not going to attend visits. A.P. recognized that she needed to be in a more stable home than Mother's home and said she just wanted to be with her siblings. The children need to be in a home free of feces, urine, rotting food, and infestation to maintain their physical, mental, and emotional health.

After a review of all the evidence, we are convinced that there is clear and convincing evidence that Mother is unfit and her unfitness is unlikely to change in the foreseeable future. We are also convinced that it was in the best interests of the children that Mother's parental rights be terminated.

Affirmed.

17